UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MARIA DEJESUS,

           Plaintiff,           :      12 Civ. 7354 (CM) (GWG)

   -v.-                  :      <u>REPORT AND
RECOMMENDATION</u>

CAROLYN W. COLVIN,          :
Acting Commissioner of Social Security,

           Defendant.     :
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

     Plaintiff Maria DeJesus brings this action pro <u>se</u> pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying her claims for Disability Insurance Benefits and Supplemental

Security Income ("SSI") under the Social Security Act.  The Commissioner has moved for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

DeJesus has not responded to the motion.  For the reasons stated below, the ~~Commissioner's~~

motion should be granted.

I.    <u>BACKGROUND</u>

    A.   <u>DeJesus's Claim for Benefits and Procedural History</u>

     DeJesus applied for disability benefits and SSI benefits on November 20, 2007, alleging

that she became disabled on March 1, 2006.  <u>See</u> Administrative Record, filed Mar. 8, 2013

(Docket # 13) ("R."), 89, 172-73.  She was insured for benefits through June 30, 2007.  R. 13.

DeJesus was in the army until she was discharged in March 2006, R. 52, 263, and has not

engaged in substantial gainful employment since that time, R. 13.

On January 31, 2008, the Commissioner denied DeJesus's application for disability and

SSI benefits. R. 109-20. DeJesus requested a hearing before an administrative law judge

("ALJ"). R. 25-26. ALJ Newton Greenberg held a hearing on October 20, 2008. R. 29-37. On

December 23, 2008, the ALJ issued a decision finding that DeJesus was not disabled. R. 86-97.

DeJesus then appealed the ALJ's ruling to the Appeals Council, R. 137-38, which granted the

request for review and remanded the case for resolution of certain issues, R. 98-102. A second

hearing was held before ALJ Robert Dorf on March 11, 2011. R. 38-83. On March 18, 2011,

ALJ Dorf issued a decision finding that DeJesus was not disabled. R. 8-21. DeJesus once again

appealed the ALJ's ruling to the Appeals Council, R. 5-6, but her request for review was denied

on July 27, 2012, R. 1-3.

On September 28, 2012, DeJesus filed the instant pro se lawsuit seeking review of the

ALJ's decision under 42 U.S.C. §§ 405(g) and 1383(c)(3). See Complaint, filed Sept. 28, 2012

(Docket # 2). On August 2, 2013, the Commissioner moved for judgment on the pleadings. See

Notice of Motion, filed Aug. 2, 2013 (Docket # 24); Memorandum of Law in Support of the

Commissioner's Motion for Judgment on the Pleadings, filed Aug. 2. 2013 (Docket # 25). When

DeJesus failed to respond to the motion, the Court issued an order sua sponte extending her time

to do so. See Order, filed Sept. 16, 2013 (Docket # 27). Notwithstanding this Order, DeJesus

has filed no papers in opposition to the Government's motion.

      B.     The Administrative Record Before the ALJ

          1.     Treating Source Records

There are no treating source records for the relevant time period, March 2006 to June

2007. Since August 2007, however, DeJesus has received treatment on a weekly basis from Dr.

Paul Salkin, M.D., a licensed psychiatrist. R. 201, 224, 379. On March 4, 2009, Dr. Salkin

completed a Mental Medical Source Statement Questionnaire in which he evaluated the severity

of DeJesus's mental health problems. R. 224, 348-58. In his clinical findings, Dr. Salkin

reported the following symptoms: "cutting herself, urge to cut, depression, cannot focus, [and]

anxiety." R. 348. Using the Diagnostic and Statistical Manual of Mental Disorders ("DSM")

system of classifications, he diagnosed DeJesus with Bipolar II Disorder, Panic Disorder without

Agoraphobia, and Attention-Deficit/Hyperactivity Disorder (Predominantly Inattentive Type) on

Axis I, Major Depressive Disorder (Single Episode, Moderate) on Axis II, and asthma on Axis

III. R. 348.[1] On Axis V, Dr. Salkin gave DeJesus a GAF score of 45, id., which indicates

"[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or

any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to

keep a job)," DSM at 34.[2] Based on this assessment, Dr. Salkin gave DeJesus a "guarded"

---

[1] The DSM is "[a] system of classification, published by the American Psychiatric
Association, that divides recognized mental disorders into clearly defined categories based on
sets of objective criteria." Stedman's Medical Dictionary 492 (27th ed. 2000) ("Stedman").
"DSM is widely recognized as the diagnostic standard . . . ." Id. The DSM utilizes "a multiaxial
system whereby different aspects of a patient's condition could be separately assessed." Id. The
axes are defined as follows:

| | |
|---|---|
| Axis I | Clinical Disorders [and] Other Conditions That May Be a Focus of Clinical Attention |
| Axis II | Personality Disorders [and] Mental Retardation |
| Axis III | General Medical Conditions |
| Axis IV | Psychological and Environmental Problems |
| Axis V | Global Assessment of Functioning |

Diagnostic and Statistical Manual of Mental Disorders 27 (4th ed., text revision 2000) ("DSM").

[2] The GAF scale reports an individual's "psychological, social, and occupational
functioning" and is "particularly useful in tracking the clinical progress of individuals in global
terms, using a single measure." DSM at 32-33.

3

prognosis. R. 348. Dr. Salkin's questionnaire also noted that DeJesus was taking prescribed

medications for her mental conditions, including Strattera, Prozac, and Seroquel. Id.

Dr. Salkin's report indicated that DeJesus's psychiatric issues impacted her day-to-day

living. Dr. Salkin found that DeJesus had "marked" restrictions in the following areas:[3]

restriction of activities of daily living; difficulties in maintaining social functioning; and

deficiencies of concentration, persistence, or pace. R. 349. He also checked a box on the form

indicating that DeJesus had one or two "episodes of decompensation [w]ithin [a] 12 month

period, each of [which is] at least [t]wo weeks duration."[4] Id. Additionally, Dr. Salkin evaluated

DeJesus's ability to perform work-related activities "on a day-to-day basis in a competitive work

setting," finding DeJesus's capabilities in most categories to be "Unable to Meet Competitive

Standards." R. 350.[5] Dr. Salkin concluded from this that DeJesus's mental condition "has

---

[3] As indicated in the questionnaire: "Marked means more than moderate but less than Severe (Extreme). A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis." R. 349.

[4] "Episodes of decompensation" were defined on the form as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace." R. 349. Dr. Salkin's response to this question was inconsistent with a later answer that indicated there had been three episodes of decompensation. R. 351.

[5] Specifically, Dr. Salkin found DeJesus to be "Unable to Meet Competitive Standards" in the following areas identified on the form: maintain attention for two hour segments; maintain regular attendance and be punctual within customary, usually strict tolerance; sustain an ordinary routine without special supervision; work in coordination with others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; and deal with

caused more than a minimal limitation of ability to do any basic work activity" and that "even a minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate." R. 351. Finally, Dr. Salkin predicted that, if DeJesus started working again, her mental condition would cause her to be absent from work more than four days per month. Id.

On February 13, 2011, Dr. Salkin completed a follow-up Mental Medical Source Statement Questionnaire in which he provided an update on DeJesus's mental health. R. 225, 450-54. According to the questionnaire, DeJesus had achieved minor improvements, but she still faced significant limitations. Using the DSM system of classifications, Dr. Salkin diagnosed DeJesus with Major Depressive Disorder (Single Episode, Moderate) and Bipolar II Disorder on Axis I, R. 450, and gave DeJesus a GAF Score of 55, which indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)," DSM at 34. Dr. Salkin noted that DeJesus was taking several medications for her condition, including Lexapro, Xanax, and Topamax. R. 450. Dr. Salkin did not note whether DeJesus had continued to cut herself or engage in any other self-abusive behavior. In this second questionnaire, Dr. Salkin assessed that DeJesus continued to have marked restriction in activities of daily living, marked difficulties in maintaining social functioning, marked deficiencies of concentration, persistence, or pace, and one or two episodes of decompensation within a 12 month period. R. 451. However, Dr. Salkin did report a slightly improved prognosis

---

normal work stress. R. 350. In the areas of "[u]nderstand[ing] and remember[ing] very short and simple instructions" and "carry[ing] out such instructions" he found her ability to be "Limited But Satisfactory." Id. He found her ability to "[r]emember work-like procedures" to be "Seriously Limited But not Precluded." Id.

for DeJesus's capabilities to function in a work environment.  In contrast to the first report, in

which Dr. Salkin found DeJesus to be unable to meet competitive standards in most categories of

mental capabilities, in this second report, Dr. Salkin found DeJesus's capabilities in all

categories to be "[s]eriously [l]imited, [b]ut not [p]recluded."  R. 452.  Additionally, this time

Dr. Salkin did not check off the box indicating that "a minimal increase in the environment

would be predicted to cause [her] to decompensate."  R. 453.  Nevertheless, Dr. Salkin still

predicted that DeJesus would likely be absent from work more than four days per month.  Id.

In addition to Dr. Salkin's questionnaires, the record contains DeJesus's medical records

from her visits to Bellevue Hospital Center from January 16, 2008, until February 10, 2011.

R. 359-78.  In a checkup visit on January 16, 2008, DeJesus reported having various physical

and mental problems.  R. 376.  She told the treating physician that she was having regular

asthma attacks, that she had previously suffered from hip bursitis[6] during her pregnancy, and that

she had knee pain.  Id.  She also informed the physician that she was depressed and had social

anxiety.  Id.  In a follow-up visit on August 20, 2008, the physician found that DeJesus was

"abnormal[ly] anxious" but that she had "no pain issues at this time."  R. 374.  On September 11,

2008, DeJesus reported that she was having migraine headaches on a regular basis, R. 373, but

by November 3, 2008, the physician reported that DeJesus was having no pain issues, R. 378.

On November 14, 2008, DeJesus returned to the clinic for her continued asthma problems,

noting that it was exacerbated at night but that she was using albuterol to combat it and was

trying to quit smoking.  R. 371.  At her next visit to Bellevue Hospital on February 24, 2009, the

---

[6] Bursitis is an "[i]nflammation of a bursa," Stedman at 262, which is a "closed sac or
envelope lined with synovial membrane and containing fluid, usually found or formed in areas
subject to friction," id. at 259.

physician found that DeJesus's migraine issues were "stable" and that her asthma condition was

"controlled." R. 370. Additionally, the physician found her psychiatric condition to be "alert"

and "oriented" and noted that she was "not suicidal." R. 369-70. At an appointment on April

16, 2009, DeJesus reported having bursitis and lateral leg pain that became "worse with climbing

stairs." R. 366.

The next clinic record is from an appointment on November 4, 2010, during which

DeJesus was treated for flu-like symptoms. R. 363. In the record for this appointment, the

treating physician noted DeJesus's history of anxiety, depression, and asthma but did not

mention her bursitis or other pain problems. R. 364. The final clinic record at Bellevue Hospital

comes from February 10, 2011. R. 360. DeJesus told the physician that her asthma had

improved and that she "ha[d] not needed to use her albuterol at all." Id. The physician reported

that DeJesus denied being fatigued or having a depressed mood, id., and that DeJesus was having

"no pain issues at this time," R. 361.

2.   Federation Employment Guidance Service

DeJesus was evaluated by the Federation Employment Guidance Service ("F.E.G.S.")

for the first time from June to July 2007, at the end of the Social Security eligibility period.

R. 227-50. During the evaluation, DeJesus reported that she took care of her eight-month-old

daughter and performed household chores but that she could not mop, vacuum, or lift heavy

items because of joint problems. R. 232. DeJesus also mentioned that she had supportive

friends, enjoyed reading, and attended church every other week. Id. Additionally, DeJesus

reported that she had received her GED and could travel independently by bus or train. Id.

Nevertheless, DeJesus asserted that she could not work because she suffered from various

7

physical problems, including joint pain, bursitis of the hip, knee pain, and asthma, and from psychological problems, including depression. R. 232-33.

Although DeJesus was not receiving mental health services at the time of the F.E.G.S.'s evaluation, she was given a PHQ-9 score of 18, R. 231, indicating moderately severe depression, R. 239.[7] In response to inquiries as to how often she felt certain symptoms, she responded that "nearly everyday" she: felt down, depressed, or hopeless; had trouble falling asleep, felt tired or had little energy; felt bad about herself or felt like a failure; and had trouble concentrating on things, such as reading the newspaper or watching television. R. 231. As to whether she felt she would be better off dead or like hurting herself, she responded that she felt like this "on several days." Id. Furthermore, DeJesus claimed that, because of these issues, she found it "very difficult" to "do [her] work, take care of things at home, or get along with other people." Id. DeJesus denied having any suicidal or homicidal behavior. Id.

A F.E.G.S. social worker assessed that DeJesus possessed work skills, good cognition, and a significant support system. R. 232. The social worker also found that DeJesus was capable of thinking clearly, traveling independently, and maintaining adequate grooming. Id. On June 29, 2007, a F.E.G.S. examiner reported that DeJesus had bursitis of the hip during pregnancy, mild hip joint tenderness, knee pain, longstanding depression, insomnia, mood swings, a history of self-mutilation, and infrequent suicidal thoughts. R. 235.

On July 12, 2007, Susan Fields, M.D., evaluated DeJesus's various physical and psychological issues. R. 235-38. Dr. Fields assessed that DeJesus had a present pain level of 7

---

[7] "PHQ–9 stands for 'Patient Health Questionnaire' and is used to assess and monitor the severity of a patient's depression and/or anxiety." Rodriguez v. Astrue, 2013 WL 1225394, at *7 n.7 (E.D.N.Y. Mar. 27, 2013) (citation omitted). It is self-administered. Briscoe v. Astrue, 892 F. Supp. 2d 567, 570 n.1 (S.D.N.Y. 2012).

out of 10 and that DeJesus's pain level ranged from 5 to 10. R. 235. However, she did not find

that DeJesus had any specific physical work restrictions, recording that DeJesus would be

capable of sitting, standing, walking, pulling, climbing, bending, kneeling, reaching, and

grasping up to 4 to 5 hours in an 8 hour period. R. 235-36. Fields diagnosed DeJesus with

bursitis of the hip joints, knee pain, bipolar disorder, and panic disorder without agoraphobia. R.

237. Fields ruled out post-traumatic stress disorder. Id. She concluded that DeJesus's "unstable

medical and/or mental health conditions . . . require treatment (a Wellness Plan) before a

functional capacity outcome can be made." Id. Accordingly, Dr. Fields placed DeJesus on a

"Wellness Plan" for three months before making a functional capacity determination. R. 237,

249.

From December 31, 2008, to January 6, 2009, the F.E.G.S. examined DeJesus for a

second time to determine if her mental health condition had improved since she was placed on

the "Wellness Plan." R. 311-47. DeJesus reported to the examiner that she had a history of

mental health issues and that she was being treated by Dr. Salkin. R. 320. She stated that she

had, in the past, thought about hurting or killing herself and that she had made five suicide

attempts, with the most recent attempt being in 2005. Id. However, she also reported that she

was currently taking Prozac and Xanax and that she was no longer having suicidal ideation. Id.

In this examination, DeJesus complained that she continued to suffer from the following issues

"nearly everyday": she felt down, depressed, or hopeless; she had trouble falling or staying

asleep; she felt tired or had little energy; she felt bad about herself or felt like a failure; and she

had trouble concentrating on things, such as reading the newspaper or watching television. Id.

However, DeJesus denied having problems with her appetite or suffering from any suicidal or

self-abusive thoughts. Id. Finally, DeJesus stated that, because of these issues, she found it

9

"somewhat difficult" to "do [her] work, take care of things at home, or get along with other people." Id. This answer reflected a slight improvement from DeJesus's previous F.E.G.S. examination where she reported that her mental health issues made it "very difficult" to manage. R. 231.  Based on her answers in this report, DeJesus was given a PHQ-9 Score of 16, R. 320, which indicated moderately severe depression, R. 332.  The social worker assigned to DeJesus's case reported that DeJesus was capable of traveling independently by bus or train, that she was currently taking care of her two-year-old daughter, that she had emotionally supportive friends, and that she occasionally attended church.  R. 321-22.  At the same time, the social worker noted DeJesus's complaint that she could not work "due to bipolar, panic attacks, back pains, [and] asthma."  R. 322.

As part of the F.E.G.S. examination process, on December 31, 2008, Dr. James Nguyen, M.D., examined DeJesus to evaluate the ongoing status of her physical and mental health issues. R. 324.  First, DeJesus reported to Dr. Nguyen that she had been diagnosed with, and was currently suffering from, bipolar disorder, posttraumatic stress disorder, depression, anxiety, asthma, and back pain.  R. 323.  Dr. Nguyen then performed a physical examination of DeJesus and made the following findings: she had minimal tenderness on the left side of her lumbosacral spine, she had no loss of range of motion, the straight leg raise test result was negative, and she had no bony tenderness.  R. 326.  From this, Dr. Nguyen concluded that DeJesus had no physical limitations in her ability to work and that she could lift and carry up to 20-50 pounds one to ten times per hour.  R. 327.  However, he determined that there were several environmental limitations on DeJesus's ability to work, recommending that she avoid workplaces with dust, extreme heat, or extreme coldness.  Id.

10

Additionally, on December 31, 2008, a F.E.G.S. staff member evaluated DeJesus's psychological issues. R. 336. DeJesus told the staff member that she had the following symptoms: mood swings, depressed mood, insomnia, anxiety/fearfulness, and poor concentration. R. 336-37. The staff member assessed that DeJesus was well-groomed and cooperative but that she appeared restless and depressed. R. 337. Additionally, the staff member noted that DeJesus had poor concentration and a limited attention span. R. 338. The staff member determined that in the workplace DeJesus would face "moderate" functional impairment in her ability to follow work rules, accept supervision, maintain attention, relate to co-workers, and adapt to change. Id. She would face "severe" impairment in her ability to deal with the public and adapt to stressful situations. Id. The F.E.G.S. staff member used the DSM system of classifications to diagnose DeJesus with Bipolar I Disorder, Panic Disorder with Agoraphobia, and Attention-Deficit/Hyperactivity Disorder NOS on Axis I and asthma on Axis III. R. 339. Additionally, the staff member gave DeJesus a GAF score of 35, signifying that DeJesus suffered from "[s]ome impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." See DSM at 34. Consequently, the staff member judged DeJesus to be "[p]ermanently disabled from work," R. 339, and recommended that she receive SSI benefits, R. 340. At the close of the F.E.G.S. investigation of DeJesus, on January 6, 2009, Dr. Nguyen concurred with the staff member and made the following employment disposition for DeJesus's case: "substantial functional limitations to employment due to medical conditions that will last for at least 12 months and make the individual unable to work." R. 329. Dr. Nguyen noted the following factors in support of this disposition: "bipolar disorder; panic disorder; agoraphobia; attention deficit disorder; all chronic and unstable . . . multiple psychiatric admissions for

11

suicidality and multiple medication trials . . . [patient's] psychiatrist is supporting her SSI

application. I concur that patient should be assisted to obtain SSI benefits due to her chronic,

persistent and treatment resistant mood disorder." Id. Dr. Nguyen noted that this disposition

was not at all based on DeJesus's alleged physical problems, that her asthma was "stable" and

that her back pain "should not affect employment." Id.

        3.     Dr. Justin Fernando, M.D.

On December 5, 2007, Dr. Justin Fernando, M.D., a consultative orthopedist at Industrial

Medicine Associates, P.C., performed a consultative orthopedic examination of DeJesus at the

behest of the Social Security Administration. R. 17, 93, 256-59. DeJesus reported to Dr.

Fernando that, in addition to her various psychological issues, she suffered from pain in both

knees. R. 256. She also told Dr. Fernando that she "does all the activities of daily living with

the exception of shopping." R. 257. Dr. Fernando observed that DeJesus's general appearance

was normal, in that she "appeared to be in no acute distress," that she could "walk on heels and

toes without difficulty," that she "[u]sed no assistive device," and that she was able to "rise from

[her] chair without difficulty." Id. After examining DeJesus, Dr. Fernando made the following

findings: her hand and finger dexterity was intact; her cervical spine was capable of full flexion,

extension, lateral flexion, and rotary movement and exhibited no cervical or paracervical pain;

she had a full range of motion of her shoulders, elbows, forearms, wrists and fingers; she

exhibited no joint inflammation, effusion, or instability; her thoracic and lumbar spines were

capable of full flexion, extension, later flexion, and rotary movement and exhibited no spinal or

paraspinal tenderness; she had a full range of movement of her hips, knees, and ankles; and she

had some joint tenderness in both knees. R. 257-58. From these findings, Dr. Fernando

diagnosed DeJesus with "chronic pain in both knees (possible chronic degenerative changes in

the joints)." R. 258. Overall, Dr. Fernando gave DeJesus a good prognosis, concluding that

"[a]part from a mild degree of tenderness in the jointlines of both knees, no other physical

finding was evident to support her claim of pain in both knees." Id.

        4.     Dr. Walter Spear, Ph.D.

On December 10, 2007, Dr. Walter Spear, Ph.D., a licensed psychologist at Industrial

Medicine Associates, P.C., performed a consultative psychological examination of DeJesus.

R. 17, 262-65. Dr. Spear noted that DeJesus had never been hospitalized for psychiatric reasons

and that she had been receiving weekly psychiatric treatment from Dr. Salkin. R. 262. DeJesus

complained to Dr. Spear that she was having difficulty falling asleep and that she had a loss of

appetite. Id. She also reported having "depressive symptoms that include dysphoric moods,

crying spells, feelings of hopelessness, irritability, fatigue/loss of energy, worthlessness,

diminished self-esteem, and recurrent thoughts of death, but no plan or intent to hurt herself."

Id. Additionally, DeJesus complained of having excessive apprehension, getting agoraphobic,

and having panic attacks in crowds and on subways. Id. DeJesus further explained that her

panic attacks were accompanied by "palpitations, fear of losing control, sweating, dizziness,

breathing difficulties, and trembling." Id.

DeJesus was cooperative during the exam and "[h]er manner of relating was adequate."

R. 263. Dr. Spear observed that DeJesus was dressed appropriately and well-groomed, that her

gait, posture and behavior were normal, and that her eye contact was appropriate. Id. He found

her speech to be "[f]luent and clear" and her thought process to be "[c]oherent and goal directed

with no evidence of hallucinations or delusions." Id. However, she had a somewhat depressed

affect and dysthymic mood. Id. Dr. Spear judged DeJesus's attention and concentration to be

intact, noting that she "easily did simple calculations." Id. Furthermore, her recent and remote

13

memory skills were intact, and she was able to successfully complete simple memory tests. Id.

Dr. Spear found her intellectual functioning to be average and her insight and judgment to be

fair. R. 264. He noted that, on a daily basis, DeJesus was able to dress, bathe, and groom herself

and that she could cook, clean, do laundry, shop, manage money, and take public transportation

by herself. Id. DeJesus reported that she had friends that she liked to sit and talk with but had a

difficult relationship with her uncle, aunt, brother, and great-grandmother. Id. DeJesus stated

that, on an average day, she "washes, takes care of her daughter, [gets] something to eat, [talks]

to her great-grandmother, [does] some chores, [has] dinner, [watches] TV, and [goes] to bed."

Id. Using the DSM system of classifications, Dr. Spear diagnosed DeJesus with Depressive

Disorder (not otherwise specified ("NOS")) with panic attack and agoraphobic symptoms on

Axis I and asthma on Axis III. Id. He opined, "she can follow and understand simple directions,

perform simple tasks, maintain attention and concentration, maintain a regular schedule, and

learn new tasks." Id. Additionally, he believed that she "can perform complex tasks with

supervision . . . make appropriate decisions and relate adequately with others." Id. However, he

noted that "she has trouble dealing appropriately with stress." Id. Dr. Spear gave DeJesus a fair

prognosis and recommended that she continue to receive psychiatric treatment. R. 265.

### 5.   Dr. Z. Mata, M.D.

·On January 16, 2008, Dr. Z. Mata, a State Agency psychiatrist, prepared a "Psychiatric

Review Technique" form to assess DeJesus's mental impairments. R. 266-78. Although Dr.

Mata found that DeJesus had a Depressive Disorder NOS, R. 269, he ultimately concluded that

there was insufficient evidence to satisfy the listed criteria for an Affective Disorder as set forth

in 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.04, R. 277. Dr. Mata assessed that DeJesus had

only mild restrictions in activities of daily living and mild difficulties in maintaining social

functioning and that she had moderate difficulties in maintaining concentration, persistence, or

pace. R. 276.  On January 23, 2008, Dr. Mata submitted a "Mental Residual Functional Capacity

Assessment" form to provide further support for his findings in DeJesus's case. R. 296-99.

Based on the available evidence, Dr. Mata assessed DeJesus's capabilities to be "not

significantly limited" in the following categories: remembering locations and work-like

procedures; understanding and remembering very short and simple instructions; carrying out

very short and simple instructions; maintaining attention and concentration for extended periods;

performing activities within a schedule, maintaining regular attendance, and being punctual

within customary tolerances; sustaining an ordinary routine without special supervision; and

making simple work-related decisions. R. 296-97.  Additionally, Dr. Mata found DeJesus's

ability to work in coordination with or in proximity to others without being distracted to be

moderately limited. R. 296.  Dr. Mata only found DeJesus's capabilities to be "markedly

limited" in two categories: understanding and remembering detailed instructions and carrying

out detailed instructions. Id.  Dr. Mata stated that DeJesus did not face any significant

limitations in her social interaction or adaptation capabilities. R. 297.  Finally, Dr. Mata

concluded that the "[e]vidence shows [claimant] is able to perform basic demands of

competitive, remunerative unskilled work on a sustained basis." R. 298.  Dr. Mata explained

that, although DeJesus alleges that she has depression and a panic disorder, she has had no

psychiatric hospitalization, she is independent in her activities of daily living, she is able to

manage her own finances, she is able to maintain relationships, and her mental status

examination was within normal limits. Id.

15

C.    The October 20, 2008 Hearing

DeJesus testified before ALJ Newton Greenberg on October 20, 2008.  R. 29-37.  She testified that when she was in the army she "could not take the pressure of being there" and that she was suicidal.  R. 32.  DeJesus explained that this pressure began in boot camp, during which she was singled out and harassed by her drill sergeant.  R. 33.  When she saw a psychiatrist to discuss these issues, the psychiatrist suggested that she leave the army.  R. 32.  Because of her unhealthy mental state, DeJesus was put on the "buddy watch" system, which required that somebody watch her 24 hours a day.  R. 33.  DeJesus testified about an incident that occurred when she was home for vacation at Christmastime: "When it came time to go back, I tried to go AWOL, because I just couldn't.  I had a panic attack.  I put myself on the floor . . . And I called my sergeant and told him I was not going back.  I couldn't do it.  I wanted to kill – I just – I couldn't be there.  It was so much pressure.  I can't be in a group setting."  R. 36-37.  Eventually, DeJesus was discharged from the army when she became pregnant.  R. 32.  When she left the army, she still had not completed her training.  Id.

DeJesus testified that she went to college for two years and almost received her associate's degree.  R. 31-32.  She tried going back to school after she returned from the army but quit after "an incident that happened."  R. 35.  She explained, "I was late for class.  And I'm waiting for the bus.  As soon as the bus was coming, all I kept thinking about was how everybody would be looking at me once I got into the classroom, and I didn't get on the bus.  I went right back home.  I tried school, it didn't work."  Id.  DeJesus testified that she still enjoyed reading but that she was not currently reading any books.  R. 35-36.

When asked by the ALJ why she could not work, DeJesus responded, "I can't go outside much and if I do, I have to be accompanied by someone.  And I have panic attacks.  While I'm

16

on the subway, walking down the street, my heart starts to race.  It's just debilitating to me."

R. 33.  She testified that she has received treatment as an outpatient at psychiatric hospitals.

R. 34.  DeJesus admitted that she was capable of bathing, changing the diapers of, and feeding

her infant daughter but asserted that "[s]ometimes I just have to walk away [and] her

grandmother helps me out with that."  Id.  DeJesus further testified that she had very little social

interaction, saying that she had one or two friends but that she did not go out with them and just

spoke with them on the phone.  R. 35.  When asked whether she was capable of doing daily

chores, DeJesus claimed that she did not do them some days because "[s]ometimes it's hard to

just get out of bed."  R. 36.

      D.    The ALJ's December 23, 2008 Decision

      On December 23, 2008, ALJ Greenberg issued a decision denying DeJesus's request for

disability and SSI benefits.  R. 86-97.  First, the ALJ concluded that DeJesus's disability

insurance coverage ended on June 30, 2007, and that she had not engaged in substantial gainful

activity since March 1, 2006.  R. 91.  Next, the ALJ found that DeJesus suffered from a

depressive disorder and an adjustment disorder but that she would nevertheless be able to meet

the basic mental demands of unskilled work.  Id.  The ALJ further found that "[t]he evidence

does not establish any severe impairments referable to her morbid obesity, an anxiety disorder

with panic attacks and/or agoraphobia, or hip, knee or respiratory disorders."  Id.

      The ALJ determined that DeJesus's impairments did not meet or equal any of the

impairments listed in 20 C.F.R. Pt. 404, Subpart P., App. 1.  R. 93.  Specifically, her alleged

physical issues, including the knee pain and hip bursitis, did not satisfy the listings for joint

inflammation under § 14.09, disorders of the spine under § 1.04A, or disorders impairing the

ability to ambulate under § 1.02A.  Id.  Additionally, DeJesus's mental impairments did not

satisfy the criteria set forth in § 12.00. Id. The ALJ stated that his findings were "generally

consistent" with the opinions and examination findings of Dr. Fernando, Dr. Spear, and the

F.E.G.S. R. 94. He explained that his decision was based on evidence suggesting that DeJesus

had received only "conservative medical treatment," that no treating or examining source had

found that she was disabled, and that her work cessation was due to her pregnancy and not

because of any medical issues. Id. Furthermore, "the evidence . . . shows the claimant as being

quite functional with regard to her activities of daily living [in that] [s]he is fully independent in

all aspects of her self-care . . . is able to cook, clean, do laundry and shop . . . can travel alone by

means of public transportation . . . [and] she cares for her infant daughter." R. 94-95. The ALJ

reasoned that "[s]uch a level of activity is not consistent with the degree of functional

compromise purported." R. 95.

      E.      First Proceeding Before the Appeals Council

      On February 10, 2009, DeJesus submitted a request for review of the ALJ's decision to

the Appeals Council. R. 137-38. On July 28, 2009, the Appeals Council granted DeJesus's

request for review and remanded the case to an ALJ for further proceedings. R. 98-102. The

Appeals Council found that the ALJ's decision failed to address the opinion of treating sources

such as Dr. Salkin and that, for the medical opinions the decision did discuss, it failed to state

how much weight it was giving to them. R. 99-100. Additionally, the ALJ's decision failed to

"provide a complete, clear statement regarding the claimant's residual functional capacity," in

that it did not adequately identify DeJesus's ability to perform work-related physical and mental

activities or clearly describe all of her functional limitations and restrictions. R. 100. Finally,

the Appeals Council noted that the information provided about DeJesus's work history was

unclear so "[a]dditional development and evaluation of the claimant's past work is necessary."
Id.

The Appeals Council directed the ALJ on remand to "[g]ive further consideration to the
claimant's maximum residual functional capacity . . . provide rationale with specific references
to evidence of record in support of any assessed limitations . . . [and] evaluate the treating and
nontreating source opinions . . . and explain the weight given to such opinion evidence." Id.
Additionally, on remand, the ALJ was to "[f]urther develop and evaluate the claimant's work
history and make findings and conclusions regarding whether any of the work represents past
relevant work" and "obtain evidence from a vocational expert to clarify the effect of the assessed
limitations on the claimant's occupational base." R. 101.

F.    The March 11, 2011 Hearing

A second hearing was held on March 11, 2011, before ALJ Robert Dorf. R. 38-83.
During this hearing, DeJesus was assisted by a non-attorney representative. R. 40. Before
DeJesus's testimony began, the ALJ summarized the evidence in the record, including the
reports from treating psychiatrist Dr. Salkin, the medical records from Bellevue Hospital, the
F.E.G.S. reports, Dr. Mata's report, Dr. Spear's psychological report, and Dr. Fernando's
orthopedic report. R. 42-44. Next, DeJesus's representative gave an opening statement, arguing
that DeJesus should be found to be disabled because DeJesus's "non-exertional and exertional
impairments present us with a profile of an individual who would be unable to function in a
competitive work environment on a full time basis." R. 45.

The ALJ first questioned DeJesus about her ability to take care of her daughter. DeJesus
testified that she had taken care of her four-year-old daughter since the child was born in 2006
and had not had any problems with the Administration for Children's Services. R. 46. DeJesus

19

fed, bathed, and clothed her daughter "[w]ith help." Id. She testified that she lived with her

daughter and her ex-mother-in-law. R. 47-48. When asked whether she had ever been admitted

to stay at a hospital for any mental or physical reason, she replied that she had not. R. 47.

DeJesus testified that she was able to take her daughter to a pediatrician and to follow the

pediatrician's instructions for her daughter's health. R. 59-60. DeJesus was able to meet with

and get along with her daughter's teachers. R. 60. DeJesus was also able to watch her daughter

to make sure that she did not do anything dangerous. R. 61. DeJesus stated that she took her

child to school most days but that she did not take her child to parks or other places. R. 62. She

regularly went clothes shopping and sometimes food shopping for her daughter. R. 63. She also

helped her daughter get ready for school in the morning and put her to sleep at night. R. 65.

When questioned about her time in the army, DeJesus explained that she completed basic

training but did not complete advanced training. R. 48. When asked specifically about basic

training, DeJesus testified that she "would get injured and [that she] didn't get to do a lot of the

things." R. 49. She explained, "[m]y knee was always hurting and I sprained both my ankles."

Id. She admitted to successfully completing a two-mile run in the required time but asserted that

she ran it at "a slow pace." R. 49-50. Additionally, she completed the rifle firing course and

achieved "marksman" status. R. 51. When she entered advanced training, she was assigned to

the supply division. Id. As part of her training to become a supply specialist, DeJesus attended

classes on a regular basis. R. 52. DeJesus testified that when she was in basic training, she was

hospitalized for one day for psychiatric reasons. R. 50-51. Then, when she started advanced

training, she started to see any army psychiatrist on an outpatient basis because she was suffering

from depression and had suicidal thoughts. Id.

20

DeJesus also testified that she had received her GED, R. 48, and had attended college for two years at a technical school called Catherine Gibbs, R. 53. At Catherine Gibbs, DeJesus studied graphic design and used various computer programs such as Photoshop. Id. DeJesus testified that she continued to regularly use a computer but not every day. R. 53-54. Prior to joining the army, DeJesus worked as a delivery person for Fresh Direct but quit after one day because she hurt herself. R. 55. When she was taking classes at Catherine Gibbs, she had a work-study job doing data filing for about three hours a day. R. 55-56. Most recently, in 2008 and 2009, DeJesus earned some money performing home attendant services for an "extended family member." R. 56-57. This work entailed various tasks such as sitting with the family member, talking with him, making sure he took his medicine, and "making sure he was okay." R. 57. DeJesus testified that this job was for about six hours a day. R. 58. DeJesus has not had any other form of work since this job ended. R. 61.

DeJesus sometimes used public transportation and she came to the hearing by subway. R. 53. She was able to "slowly" walk down the stairs to the subway. Id. She later testified that she was able to walk two blocks to the supermarket but that she was not able to walk more than two blocks. R. 63. She next reported that she had problems with her memory and that she "forgets things a lot." R. 64. She had not had any confrontations with her neighbors or with other people. R. 62. However, she testified, "I get bad vibes from people sometimes – especially outside, like on a subway platform. Since I hear so many bad things happening I also fear that someone is going to try to push me into the train." R. 65. DeJesus stated that she preferred to travel with somebody when taking the subway or the bus. R. 65-66. When riding the bus, she sometimes would become anxious. R. 66. Despite this, she admitted to taking the bus for her weekly visits to Dr. Salkin. R. 66-67.

21

When the ALJ asked DeJesus why she would not be able to handle a sitting job answering telephones, she responded, "[s]peaking to someone on the phone actually makes me anxious . . . I actually get anxiety when I hear a phone ring and I have to pick it up." R. 67. When the ALJ pointed out that DeJesus was carrying a cell phone, she replied that she did not pick it up much and only used it in emergencies. Id. DeJesus admitted that she could write, type, lift 10 pounds, and walk at least two or three blocks. R. 67-68. However, she said that she was currently suffering from pain, describing it as an 8 on a scale from 1 to 10. R. 68.

DeJesus's representative questioned her about her meetings with Dr. Salkin. DeJesus testified that she had been diagnosed with bipolar disorder, panic anxiety disorder, ADHD, and PTSD. R. 69. She also said that she was being treated for depression. Id. She complained that, because of her mental health issues, she could not focus on tasks a lot of the time and sometimes had trouble getting out of bed. R. 70. On days that her symptoms were especially bad, her ex-mother-in-law had to take care of DeJesus's daughter and even bring her to school. R. 70-71. DeJesus claimed that this happened two or three days a week. R. 71. However, when asked by the ALJ whether she would get out of bed every day and help her daughter get to school if the ex-mother-in-law was not around to help, DeJesus said that she probably would. R. 72. When asked whether her mental health issues have improved since she quit the army and started to be treated by Dr. Salkin, DeJesus responded that they had not improved. R. 74. She explained that the medications Dr. Salkin prescribed to her had "little or no effect." Id.

When DeJesus's testimony was finished, a vocational expert named Miriam Green took the stand to testify about the availability of jobs that DeJesus could potentially perform. R. 75. The ALJ found that DeJesus "has no past relevant work because of the fact that she didn't complete training in the Army and her work at Gibbs was essentially part time internship work

22

as a student." R. 76. The vocational expert stated that DeJesus had certain skill sets including

the ability to file documents, record-keeping, and "stock – clerk kinds of work." Id.

Additionally, DeJesus would be able to use computers to a limited extent and utilize simple

computer programs. Id. The vocational expert testified that a person with DeJesus's physical,

mental, and psychological limitations should be able to do "sedentary work that just does not

require decision making that is simple and repetitive," such as "jewelry bench work." R. 78.

The vocational expert said that there are 1,000 jewelry bench jobs locally and 50,000 jobs

nationally. Id. Additionally, the vocational expert noted that DeJesus could potentially work as

a bead stringer, a job with 1,500 positions locally and 100,000 nationally, or a charge account

clerk, a job with 1,000 positions locally and 100,000 nationally. R. 79. When asked by the ALJ

whether "there would be significant numbers of jobs in the regional and national economy that

[DeJesus] could perform with no postural activities, no dust, dirt, fumes or temperature

extremes," the vocational expert responded that there were. R. 80-81. The ALJ found the

vocational expert's testimony to be "completely credible and true." R. 81.

     G.    The ALJ's March 18, 2011 Decision

     On March 18, 2011, ALJ Robert Dorf issued a decision denying DeJesus's request for

disability and SSI benefits. R. 11-21. First, the ALJ concluded that DeJesus's disability

insurance coverage ended on June 30, 2007, and that she has not engaged in substantial gainful

activity since March 1, 2006. R. 13. Next, the ALJ found that DeJesus had depression that

"causes more than minimal functional limitations," id., but that her other conditions, including

asthma, back pain, bursitis of hip, and bilateral knee pain, were "non-severe impairments,"

R. 14. From this, he concluded that DeJesus's impairments did not meet or equal any of the

impairments listed in 20 C.F.R. Pt. 404, Subpart P., App. 1. Id. Specifically, he found that

23

DeJesus's mental impairments did not meet the criteria of listings § 12.04 and § 12.06 because she had only mild restrictions in her activities of daily living and was capable of taking care of her daughter and maintaining her household.  Id.

Next, the ALJ found that DeJesus had the "residual functional capacity to perform sedentary work" and specifically that she was capable "of performing simple, repetitive tasks, in a low stress work environment, with no decision-making required, and only occasional contact with the public, coworkers, and supervisors." R. 15.  In making this determination, the ALJ summarized the evidence in the record, including DeJesus's testimony from the hearing, the F.E.G.S. reports, Dr. Fernando's consultative orthopedic examination, Dr. Spear's consultative psychological evaluation, DeJesus's Bellevue Hospital records, the state agency forms completed by Dr. Mata, and the Mental Medical Source Statement Questionnaires completed by treating physician Dr. Salkin. R. 16-18.  The ALJ found DeJesus's testimony about her disability to be "less than credible," noting the fact that she had been capable of taking care of her child since her birth and was able to "perform all activities of daily living, travel independently, and socialize with friends and family" and had "never required hospitalization for any mental or medical reason." R. 18-19.  Additionally, the ALJ gave "little weight" to the F.E.G.S. reports because they were based on opinion evidence, including DeJesus's subjective complaints and her allegations that she had made 5 suicide attempts.  R. 19.  The ALJ also discounted Dr. Salkin's opinion, stating:

> As for claimant's treating psychiatrist, Dr. Salkin, who has essentially said that claimant
> is incapable of any work activity, I give his opinion little weight.  Claimant has clearly
> shown that she is able to function independently.  She performs all activities of daily
> living, and is the sole caregiver for a small child.  Claimant appeared at the hearing
> polite, and well-spoken and appeared more than capable, both mentally and physically, of
> engaging in work activity.

24

Id. On the other hand, the ALJ credited the opinions of consultative examiners Dr. Fernando and Dr. Spear, holding that their "findings and opinions are consistent with the preponderance of evidence and, therefore, will be afforded substantial weight." Id.

Finally, the ALJ concurred with the vocational expert's opinion that there are jobs in the local and national economy that DeJesus would be capable of performing. Id. The ALJ noted the vocational expert's testimony that, given DeJesus's age, education, work experience, and residual functional capacity, she would be able to perform such jobs as jewelry bench worker, bead stringer, or charge account clerk. R. 20. From this, the ALJ concluded that DeJesus "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and therefore, she does not qualify as disabled. Id.

H.      Second Proceeding Before the Appeals Council

DeJesus sought review by the Appeals Council. R. 5-7. On July 27, 2012, the Appeals Council denied DeJesus's request for review. R. 1-3.

II.     APPLICABLE LAW

A.      Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (citation and internal quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127–28 (2d Cir. 2008); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402

25

U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938));

<u>accord</u> <u>Burgess</u>, 537 F.3d at 127–28; <u>Matthews v. Leavitt</u>, 452 F.3d 145, 152 n.9 (2d Cir. 2006);

<u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000).

    "Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

supported by substantial evidence." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (citation

and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence

to support the Commissioner's final decision, that decision must be upheld, even if substantial

evidence supporting the claimant's position also exists." <u>Johnson v. Astrue</u>, 563 F. Supp. 2d

444, 454 (S.D.N.Y. 2008) (citing <u>Alston v. Sullivan</u>, 904 F.2d 122, 126 (2d Cir. 1990)).  The

Second Circuit has characterized the substantial evidence standard as "a very deferential

standard of review — even more so than the 'clearly erroneous' standard." <u>Brault v. Soc. Sec.</u>

<u>Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  "The substantial

evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a

reasonable factfinder would <u>have to conclude otherwise</u>." <u>Id.</u> (emphasis in original) (citation and

internal quotation marks omitted).  "The role of the reviewing court is therefore quite limited and

substantial deference is to be afforded the Commissioner's decision." <u>Johnson</u>, 563 F. Supp. 2d

at 454 (citations and internal quotation marks omitted).

    B.    <u>Standard Governing Evaluations of Disability Claims by the Agency</u>

    The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person

will be found to be disabled only if it is determined that his "impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy." Id. § 423(d)(2)(A).

        To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

        Regulations issued pursuant to the Social Security Act set forth a five-step process that

the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see

also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must

determine whether the claimant is currently engaged in any "substantial gainful activity." 20

C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity,

the Commissioner must decide if the claimant has a "severe medically determinable physical or

mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of

impairments that "significantly limits [the claimant's] physical or mental ability to do basic work

activities . . . ," id. § 404.1520(c). Third, if the claimant's impairment is severe and is listed in

20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the

claimant must be found disabled regardless of his age, education, or work experience. Id.

§ 404.1520(a)(4)(iii). Fourth, if the claimant's impairment is not listed and is not equal to one of

the listed impairments, the Commissioner must review the claimant's residual functional

capacity ("RFC") to determine if the claimant is able to do work he or she has done in the past,

i.e., "past relevant work." Id. § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity permits the claimant to do other work. Id. § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. Id. The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.   DISCUSSION

DeJesus does not specify in her complaint the grounds on which she seeks reversal of the ALJ's decision. Nor has she submitted any papers in opposition to the Commissioner's Motion for Judgment on the Pleadings. Nonetheless, we will undertake to review the decision by determining whether the Commissioner correctly applied the "treating physician" rule and whether the decision is supported by substantial evidence as required by statute.

A.   Treating Physician Rule

In general, the ALJ must give "more weight to opinions" of the claimant's treating physician when determining if a claimant is disabled. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician"). Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ must accord "controlling weight" to a treating physician's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable

28

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the claimant's] case record . . . ." Id. §§ 404.1527(c)(2), 416.927(c)(2). Inversely,

the opinions of a treating physician "need not be given controlling weight where they are

contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588

(2d Cir. 2002) (citations omitted).

  If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ

must provide "good reasons" for the weight given to that opinion. Halloran, 362 F.3d at 32–33

(citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)) (internal quotation marks omitted).

When assessing how much weight to give the treating source's opinion, the ALJ should consider

factors set forth in the Commissioner's regulations, which include: (i) the length of the treatment

relationship and the frequency of the examination; (ii) the nature and extent of the treatment

relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical

signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v)

whether the opinion is from a specialist; and (vi) other relevant evidence. See 20 C.F.R.

§§ 404.1527(c)(2), 416.927(c)(2); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31

(S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other

evidence according to the factors" listed in 20 C.F.R. §§ 404.1527(c)(2)–(6)). Courts "do not

hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given

to a treating physician[']s opinion and [should] continue remanding when [they] encounter

opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a

treating physician's opinion." Halloran, 362 F.3d at 33.

  In this case, the ALJ accorded "little weight" to treating psychiatrist Dr. Salkin's opinion

that DeJesus's psychological issues are so severe that she is incapable of performing work of any

kind. R. 19. Before determining what weight to give to Dr. Salkin's opinion, the ALJ first

summarized Dr. Salkin's statements that DeJesus "had marked restriction of activities of daily

living, difficulties in maintaining social functioning, and deficiencies of concentration" and that

she would "be unable to meet competitive employment standards." R. 18. In explaining why he

did not accept these assertions, the ALJ pointed out that there is strong evidence in the record

showing that DeJesus is capable of functioning independently in "perform[ing] all activities of

daily living" and in being "the sole caregiver for a small child." R. 19. The ALJ further noted

that DeJesus's demeanor at the hearing was "polite" and "well-spoken" and that she "appeared

more than capable, both mentally and physically, of engaging in work activity." Id.

　　　The ALJ also explained the contrary medical evidence provided by Dr. Spear and Dr.

Mata. In crediting Dr. Spear's contrary opinion, the ALJ explained that, while Dr. Spear was not

a treating source, he "examined [DeJesus] using accepted diagnostic techniques and clinical

practices" and that his "findings and opinions are consistent with the preponderance of

evidence." R. 19. The ALJ summarized Dr. Spear's findings that DeJesus's "concentration and

recent and remote memory skills were intact," that her "speech was fluent and clear," that she

was "coherent and goal directed," and that she was capable of taking care of herself and her

daughter on a daily basis. R. 17-18. The ALJ also noted Dr. Spear's conclusion that DeJesus's

"prognosis was fair" and that she "could follow and understand simple directions, perform

simple tasks, maintain attention and concentration, maintain a regular schedule, and learn new

tasks." R. 18. Additionally, the ALJ gave weight to the opinion of Dr. Mata, who found not

only that DeJesus's "mental status examination was essentially within normal limits [and that

she] is able to perform basic demands of competitive, remunerative unskilled work on a

sustained basis" but also that DeJesus "had no severe physical impairments causing any

30

limitations in her functioning." Id. Accordingly, we find that, given that Dr. Salkin's opinion

was inconsistent with other substantial medical evidence in the record, it was proper for the ALJ

to give it less than controlling weight. See, e.g., Van Dien v. Barnhart, 2006 WL 785281, at *13

(S.D.N.Y. Mar. 24, 2006) (the "ALJ appropriately gave less than controlling weight to [the

treating physician's] opinion and relied more heavily on the evidence provided in the

consultative opinions"); see generally Halloran, 362 F.3d at 32 (finding that treating physician's

opinions should not be afforded controlling weight where they were "not particularly

informative and were not consistent with those of several other medical experts").

The ALJ did not refer to the factors in 20 C.F.R. § 404.1527(c)(2) specifically, however.

While it would have made review of his decision much simpler for this Court, we do not find

this omission to require remand, as his decision discusses the substance of these factors and thus

it is clear that the ALJ considered them in assigning "little weight" to Dr. Salkin's opinion. The

ALJ explicitly considered the length, frequency, and extent of DeJesus's treatment relationship

with Dr. Salkin when he noted that DeJesus had being seeing Dr. Salkin for mental health

treatment since July 2007. R. 17. Additionally, by referring to Dr. Salkin as a psychiatrist, the

ALJ implicitly recognized that Dr. Salkin qualifies as a specialist. R. 18. The ALJ also

summarized the content of Dr. Salkin's reports. Id. Finally, as previously discussed, the ALJ

afforded great weight to the "consistency of the opinion with the record" factor in deciding to

give Dr. Salkin's opinion little weight. R. 19. Thus, while the ALJ failed to explicitly list each

factor, there is no need for remand because he "applied the substance of the treating physician

rule." See Halloran, 362 F.3d at 32; accord Botta v. Barnhart, 475 F. Supp. 2d 174, 188

(E.D.N.Y. 2007) ("Although the ALJ should 'comprehensively' set forth the reasons for the

weight assigned to a treating physician's opinion, the failure to do so does not require remand if

it can be ascertained from the entire record and the ALJ's opinion that the ALJ 'applied the

substance' of the treating physician rule.") (citations omitted); Hudson v. Colvin, 2013 WL

1500199, at *10 n. 25 (N.D.N.Y. Mar. 21, 2013) ("While [the ALJ] could have discussed the

factors listed in the regulations in more detail, this does not amount to reversible error because

the rationale for his decision is clear and his ultimate determination is supported by substantial

evidence.") (citation omitted); Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) (finding

that there is no rule requiring "an ALJ's decision to apply expressly each of the six relevant

factors in deciding what weight to give a medical opinion").

    In sum, the ALJ provided "good reasons" for discounting Dr. Salkin's opinion, including

the inconsistent medical findings of the consultative medical examiners and the hearing

testimony showing that DeJesus was capable of living independently, managing a household,

and taking care of a child.  Cf. Van Dien, 2006 WL 785281, at *14 (finding that the ALJ's

decision to discount the treating physician's opinion was supported by good reasons where the

treating physician's opinion lacked clinical findings and was contradicted by the opinions of

consultative psychiatrists); Rivera v. Comm'r of Social Sec., 728 F. Supp. 2d 297, 327-28

(S.D.N.Y. 2010) (finding that the ALJ had good reasons to reject the treating physician's opinion

where it conflicted with other medical evidence and the "plaintiff's admitted daily

activities").  Accordingly, the treating physician rule was not violated.

    B.    Substantial Evidence Test

    We next turn to the question of whether the ALJ's decision was supported by substantial

evidence.  Because DeJesus has not responded to the motion, and thus has not made arguments

as to specific findings that she believes are improper, we will examine the findings that were

material to the ALJ's determination and that appeared to be contested by DeJesus at the hearing.

32

The ALJ found that DeJesus has depression that "causes more than minimal functional limitations" and other non-severe impairments, including asthma, back pain, bursitis of hip, and bilateral knee pain, but that none of these impairments met or equaled the requirements of any of the impairments listed in 20 C.F.R. Pt. 404, Subpart P., App. 1. R. 13-14. The ALJ further determined that DeJesus has the "residual functional capacity to perform sedentary work" to the extent "of performing simple, repetitive tasks, in a low stress work environment, with no decision-making required, and only occasional contact with the public, coworkers, and supervisors." R. 15.

We conclude that there was substantial evidence to support these findings. In finding DeJesus's asthma not to be a severe impairment, the ALJ explained that DeJesus "has required no hospitalizations, intubation, or emergency room treatment." R. 14. In addition to these stated reasons, there is other substantial evidence in the record demonstrating that DeJesus's asthma was relatively mild. For example, in DeJesus's most recent Bellevue Hospital clinic record, she reported that her asthma had improved and that she "has not needed to use her albuterol at all." R. 360. Additionally, the F.E.G.S. examiner found DeJesus's asthma to be "stable." R. 329.

Furthermore, there was substantial evidence to find that DeJesus's other physical issues, including her alleged back pain, bursitis of the hip, and bilateral knee pain, were not severe impairments. The ALJ pointed out that DeJesus has not "received physical therapy or other treatment modalities," has never received x-rays or MRIs, and does not use a cane or wear a back brace. R. 14. More importantly, Dr. Fernando's consultative orthopedic examination of DeJesus revealed that these issues were relatively minor. R. 258. Specifically, Dr. Fernando determined that DeJesus had full range of movement of her hips, knees, and ankles although she had some joint tenderness in her knees. R. 257-58. From these findings, Dr. Fernando

33

diagnosed DeJesus with "[c]hronic pain in both knees" but gave DeJesus a good prognosis,

concluding that "[a]part from a mild degree of tenderness in the jointlines of both knees, no other

physical finding was evident to support her claim of pain in both knees." R. 258. Dr.

Fernando's prognosis is corroborated by Dr. Nguyen at the F.E.G.S., who found that, while

DeJesus had minimal tenderness on the left side of her lumbosacral spine, she had no loss of

range of motion and thus had no physical limitations in her ability to work. R. 326-27. Dr.

Fernando's assessment is also corroborated by F.E.G.S. examiner Dr. Fields, who did not find

that DeJesus had any specific physical work restrictions, recording that DeJesus would be

capable of sitting, standing, walking, pulling, climbing, bending, kneeling, reaching, and

grasping up to 4-5 hours in an 8 hour period. R. 235-36. Thus, the conclusions of consultative

physician Dr. Fernando, along with other supporting evidence, constituted substantial evidence

for the ALJ's finding that none of DeJesus's physical ailments were severe impairments. See

Mongeur, 722 F.2d at 1039 (noting that the report of a consultative physician can constitute

substantial evidence) (citation omitted).

Similarly, there was substantial evidence to support the ALJ's finding that DeJesus did

not have any impairments that met or equaled the listed impairments in 20 C.F.R. Pt. 404,

Subpart P., App. 1. To begin with, there was substantial evidence to support the ALJ's

assessment that the medical evidence in the record demonstrated that DeJesus's psychological

impairments, considered singly or in combination, did not satisfy the requirements of listing

12.04 (pertaining to affective disorders) or listing 12.06 (pertaining to anxiety related disorders)

because neither the paragraph B or paragraph C criteria were satisfied. R. 14-15. In order to

qualify under listings 12.04 or 12.06, two of the following paragraph B criteria must be present:

marked restrictions of activities of daily living; marked difficulties in maintaining social

34

functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpart P., App. 1. In explaining why DeJesus did not satisfy the paragraph B criteria, the ALJ first pointed out that DeJesus "spends her days caring for her 4 year old daughter, taking her to and from pre-kindergarten, feeding her, taking her to her pediatrician when necessary, and being present for necessary school visits" and that DeJesus "performs all activities of daily living, including preparing and cooking meals, cleaning, doing, laundry, shopping, and managing money." R. 14. The ALJ concluded that these facts showed that DeJesus's psychological issues had only a minimal impact on her activities of daily living. Furthermore, evidence showing that DeJesus lived with her daughter and ex-mother-in law, that she reported having supportive friends, that she had a good relationship with most family members, and that she regularly attended church suggested that DeJesus did not have marked difficulties in maintaining social functioning. Id. The ALJ also relied on Dr. Spear's findings that DeJesus's "attention and concentration and recent and remote memory skills were intact" in finding that DeJesus had only moderate difficulties in maintaining concentration, persistence, or pace. R. 15. Finally, in rejecting the satisfaction of the paragraph C criteria, the ALJ noted that there was no evidence in the record showing that DeJesus had suffered episodes of decompensation of an extended duration. Id.

The ALJ's assessment of the paragraph B and C criteria was supported by substantial evidence. For example, Dr. Spear observed DeJesus's mental faculties to be intact and her speech to be "[f]luent and clear" and her thought process to be "[c]oherent and goal directed with no evidence of hallucinations or delusions." R. 263. Furthermore, Dr. Spear opined that DeJesus "can follow and understand simple directions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, and learn new tasks" and that she "can perform

complex tasks with supervision . . . make appropriate decisions and relate adequately with others." R. 264. Dr. Mata's assessment even more directly supported the ALJ's findings that the paragraph B criteria were not satisfied. After considering DeJesus's case, Dr. Mata found that she has only mild restrictions of activities of daily living and mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace. R. 276. In a Mental Residual Functional Capacity Assessment form, Dr. Mata found that DeJesus's capabilities were "not significantly limited" in the following categories: remembering locations and work-like procedures; understanding and remembering very short and simple instructions; carrying out very short and simple instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; and making simple work-related decisions. R. 296-97. From this, Dr. Mata concluded that the "[e]vidence shows [claimant] is able to perform basic demands of competitive, remunerative unskilled work on a sustained basis." R. 298.

   Given the psychological reports from Dr. Spear and Dr. Mata, together with other objective evidence exhibiting DeJesus's ability to act independently and take care of her daughter, there was substantial evidence in the record to support the ALJ's finding that DeJesus's medical impairments did not rise to the level of satisfying any listed impairment in the Commissioner's regulations. That is not to say that there was no evidence to the contrary. For example, Dr. Salkin opined that DeJesus had marked restrictions in most of the relevant categories and that she would not be able to meet competitive work standards. R. 349. He also checked a box indicating that she had suffered extended periods of "decompensation." R. 351. However, as we previously noted, the ALJ did not err in affording Dr. Salkin's questionnaire

form little weight. Other than the forms completed by Dr. Salkin, only DeJesus's subjective complaints and the F.E.G.S. report — largely based on DeJesus's subjective statements — indicated that DeJesus had any severe psychological issues. R. 17. The ALJ gave little weight to either DeJesus's opinion or to the F.E.G.S. report. He found DeJesus not to be credible given that her testimony was largely contradicted by objective evidence exhibiting her ability to function independently and take care of her daughter. R. 18-19. Furthermore, the ALJ largely rejected the F.E.G.S.'s findings because "they based their diagnosis on claimant's subjective complaints and allegations." R. 19.

An ALJ is required to assess subjective testimony of pain and disability "in light of objective medical facts and diagnoses." Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988). In this case, the ALJ assessed DeJesus's subjective complaints regarding her psychological issues and physical pain in light of DeJesus's hospital records and the expert medical reports. In rejecting DeJesus's assertion that she sometimes felt pain at a level of 10 out of 10, the ALJ referenced Dr. Fernando's consultative orthopedic examination in which he determined that DeJesus had only minimal paraspinal tenderness. R. 17. Furthermore, in discounting the F.E.G.S.'s finding that DeJesus had a PHQ score that was indicative of severe depression, the ALJ noted that DeJesus "did not have any medical documentation in support of her many allegations" upon which the score was based. Id. Similarly, in rejecting DeJesus's claim that she had made 5 suicide attempts, the ALJ noted that Dr. Salkin never mentioned this issue in any of his treatment records for DeJesus. R. 19. Thus, we find that the ALJ properly chose to give little weight to DeJesus's unsupported complaints and claims given that he analyzed them in light of the objective medical evidence in the record.

For the same reasons, we find that the objective medical evidence in the record, including the Bellevue Hospital records and the expert reports from Dr. Spear, Dr. Fernando, and Dr. Mata, constituted substantial evidence for the ALJ's determination that DeJesus had the residual functional capacity to perform sedentary work with a sit/stand option every half hour in an environment with minimal dust, dirt, and fumes, involving "simple, repetitive tasks, in a low stress work environment, with no decision-making required, and only occasional contact with the public, coworkers, and supervisors." R. 15.

The ALJ also properly determined that there are a significant number of jobs in the local and national economy that, given DeJesus's lack of work experience and residual functional capacity, she would nevertheless be capable of performing, including positions as jewelry bench workers, bead stringers, and charge account clerks. R. 20. The ALJ based this finding on the hearing testimony of vocational expert Miriam Green, who testified that, given DeJesus's limitations, she would qualify for 50% of jewelry bench worker positions and 100% of bead stringer and charge account clerk positions. Id. Ms. Green further explained that there were a substantial number of such jobs available in the local and national economies. Id. The ALJ noted that the vocational expert's opinion was consistent with the information contained in the Dictionary of Occupational Titles. Id. The ALJ properly relied on the vocational expert's testimony regarding this issue. See Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983) (vocational expert's testimony on the availability of such sedentary jobs provided substantial evidence for the ALJ's finding on this issue); accord Santos v. Comm'r of Social Sec., 2013 WL 5883345, at *7 (S.D.N.Y. Oct. 28, 2013). In sum, there was substantial evidenced to support the ALJ's finding that there existed alternative substantial gainful employment that DeJesus would be capable of performing.

IV.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings

(Docket # 24) should be granted.

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days including weekends and holidays from service of

this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a),

(b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Colleen McMahon, and to the undersigned, at 500 Pearl

Street, New York, New York 10007.  Any request for an extension of time to file objections

must be directed to Judge McMahon.  If a party fails to file timely objections, that party will not

be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas

v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham,

Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: January 23, 2014
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy sent to:

Maria DeJesus
1735 Madison Avenue
Apt 17A
New York, NY 10029

Counsel by ECF

39